UNITED STATES of America, Appellee,

v.

Wayne PHILLIPS, Appellant.

UNITED STATES of America, Appellee,

v.

Kevin EAVES, Appellant.

Nos. 79–1446, 79–1555.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 9, 1979.

Decided Nov. 21, 1979.

Brian P. Short, Foster, Jensen & Short, Minneapolis, Minn., for appellant.

Douglas A. Kelley, Asst. U. S. Atty., Minneapolis, Minn., for appellee; Thorwald H. Anderson, Jr., U. S. Atty., and Robert Leineweber, Legal Intern, Minneapolis, Minn., on the brief.

Before GIBSON, Chief Judge, and ROSS and STEPHENSON, Circuit Judges.

STEPHENSON, Circuit Judge.

Defendants-appellants, Phillips and Eaves, appeal from their convictions by a jury of (1) entering a bank with intent to commit larceny, 18 U.S.C. § 2113(a) (paragraph 2); (2) taking and carrying away money exceeding $100.00, 18 U.S.C. § 2113(b) (paragraph 1); (3) conspiracy to commit the violation of 18 U.S.C. § 2113(a) (paragraph 2), 18 U.S.C. § 371.[1] Appellants contend that the government failed to show

1. Eaves was sentenced to ten years on Count I, ten years on Count II, and five years on Count

II. Phillips was sentenced to six years on Count I, six years on Count II, and five years

an "entry" as required by 18 U.S.C. § 2113(a); that Counts I and II were multiplicitous; that there was interference with the jury's freedom of action; and that there was insufficient evidence to sustain the jury's verdict. We affirm the district court.[2]

On August 11, 1978, appellants, with two other persons, robbed the National City Bank, Sheraton-Ritz facility, in Minneapolis, Minnesota, of $8,754.00. Phillips and Eaves drove up to a drive-in teller window at the bank and manipulated the drive-up teller mechanism. A co-conspirator, working as a teller at the bank, sent out the money. Phillips reached in and took the money out, and both appellants drove off. Another co-conspirator then walked up to the drive-up teller window and placed in the mechanism a fake bomb device and a demand note. Shortly after he walked away, the teller/co-conspirator announced that she had been robbed.[3] The theory was that if the co-conspirator who passed the note and fake bomb device was caught, since he would not have the money, he would escape prosecution.

Section 2113(a) (paragraph 2) of Title 18 provides that "[w]hoever enters or attempts to enter any bank * * * or any building used in whole or in part as a bank * * with intent to commit in such bank, * * or building, or part thereof * * * any larceny" shall be fined or imprisoned. It is appellants' contention that, primarily because of the physical structure and location of the drive-up teller mechanism, there was no entry for purposes of the statute. The trial court instructed the jury as follows:

> If you find—now, remember you start with a "blank"; I can't find anything for you, and I don't intend to—but if you come to the point where the evidence convinces you beyond a reasonable doubt that these defendants, or persons acting

with them (and I've read you the principal statute and the aiding and abetting statute) came across bank property, property owned or leased by the bank, and manipulated the mechanism there for the purpose of committing the crime of taking money of the bank, then you may find that to be covered by the statute which prohibits entering a bank.

> So if they went up on that property knowingly and willfully knowing that they were going to do it for the purpose of committing this crime of bank larceny and they manipulated this machinery provided by the bank in furtherance of that, if you find that beyond a reasonable doubt, then that would be prohibited by the statute in terms of the place at which they did it, you see, because the statute says, "Whoever enters any bank or any building used in whole or in part as a bank." If you find they went up onto that leased property and manipulated that machinery, that's enough for finding the necessary entry under the law, you see.

Appellants argue that all they did was drive into a driveway next to the bank; it is their argument that the trial court failed to make a distinction between entry into a building or part thereof, which the statute requires, and entry onto the property, which they allege is not covered by the statute.

In *United States v. Lankford*, 573 F.2d 1051 (8th Cir. 1978), our court was faced with a similar question involving the same statute and a night depository of a bank. The depository mechanism was located on the outside wall of a bank building in a recessed entryway leading to the main entrance to the bank. When deposits were placed in the depository, they would fall down a chute inside the wall into a safe. Our court stated:

---

on Count III. The sentences on Counts II and III were to run concurrently with the sentence on Count I for both defendants.

**2.** The Honorable Miles W. Lord, United States District Judge for the District of Minnesota, presiding.

**3.** The two co-conspirators pled guilty to conspiracy to rob the bank and were the major government witnesses against the appellants.

■ The words of the statute reading "such bank, . . . or building, or part thereof, so used" reflect that Congress by appropriate language intended to make it a crime to enter any part of a bank building with intent to steal. The depository chute at the National Bank of Washington is located inside the outer wall of the bank, and the safe which receives the night deposits is located inside the inner wall of the bank. We hold under these circumstances that an attempt to enter the night depository is an attempt to enter the bank within the meaning of the statute.

*Id.* at 1053. In this case, the drive-up window is similar to the night depository discussed in *Lankford.* The receptacle is attached to the outside wall of the hotel building with a conveyor belt which runs under the floor to the office area in the hotel that the bank leases from the Sheraton-Ritz. The bank also leases the driveway up to the window, the receptacles, and the conveyor belt, which carries to the office inside the building the tubes in which the customers place their slips and money. We hold that "entry" was proved sufficiently to satisfy 18 U.S.C. § 2113(a).

■ Appellants also contend that Counts I (18 U.S.C. § 2113(a)) and II (18 U.S.C. § 2113(b)) are multiplicitous.

Under Count I the government was required to show entry with intent; under Count II the government had to show that the appellants (1) took the money, (2) carried it away, and (3) intended to do so, knowing it belonged to the bank. Appellants' claim of multiplicitous counts is without merit.

■ Appellants next claim that the trial court improperly denied their motion for a new trial. Basically, appellants contend that because of alleged nonverbal and verbal conduct of the spectators at the trial, the jury was nervous and resentful and thus unable to render a fair, unbiased verdict based on the evidence presented.[4] The appellants' claim is based upon the speculation that, because the jury members requested of the United States Marshal that they be protected after the case was over, there must have been some contact between the jurors and third persons which made the jurors nervous and resentful. Appellants argue that the record reflects that there were a number of spectators, friends and members of the families present in the courtroom throughout the trial and that, "at the very least," members of the jury could have been intimidated by this. Thus, based on *Remmer v. United States,* 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1956), the government must establish that the supposed "contact" was harmless.

The fault with the appellants' argument is that there has been no showing of a private communication or contact between a third party and a juror during the trial about the matter pending before the jury. Earlier in this trial, the husband of a juror did come in and reported to the trial court that he had received a phone call from an unidentified female who stated, "The lady will vote negative." He told the trial court that he had not told his wife of the call. After hearing this, the trial court asked all of the jurors, individually, if anything unusual had happened in connection with the case. All but two, including the wife of the man who had received the call, said no.

The other two stated as follows:

[JUROR # 1]: A minor incident. One of the jurors—some of the people have been in the courtroom—she was smiling, and somebody asked her what she was smiling about. That's the only thing I'd heard.

\* \* \* \* \* \*

[JUROR # 2]: I don't—not really. I think possibly, as I was leaving the building Wednesday—

---

4. Appellants filed their motion more than seven days after the jury's verdict and based their motion on newly-discovered evidence, as required for consideration by Fed.R.Crim.P. 33. Although the case was on appeal at the time the motion was filed, the trial court does have power to deny the motion. 8A J. Moore, Federal Practice & Procedure ¶ 33.03[2] n.17 (rev. ed. 1979). *See Richardson v. United States,* 360 F.2d 366 (5th Cir. 1966).

THE COURT: Yes, just tell us.

[JUROR # 2]: I'm not really sure if it happened this way.

But I was smiling and looking for one of the other jurors, to talk with them.

And one of the women that was sitting in the courtroom said to me—or I'm not sure she said it to me, because I didn't look at her—and she said, "Why are you laughing at me?," and I just looked—

THE COURT: "Why are you laughing?" Could you identify which one it was?

[JUROR # 2]: I could only identify her in that she had a hat on with a feather; however, I don't really know that she was talking to me; but I thought she might have been.

THE COURT: All right, thank you.

The wife of the man who received the phone call was excused and replaced with an alternate.

The appellants do not rest their argument on the phone call incident; nor do they rest their argument upon the incident concerning the questioning of the juror as to why she was laughing. As stated in their brief, appellants base their argument upon the presumption that, because the jurors asked for protection, there must have been some contact between the jurors and third persons or, at the very least, intimidation by the spectators' "unusual appearances and actions." The Second Circuit discussed an even more involved situation in *United States v. Bufalino*, 576 F.2d 446, 451 (2d Cir. 1978), *cert. denied*, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1979):

> At issue here are laughs, stares, rebuffed efforts to start conversations and the entry of an unidentified female into the juror's bathroom following a plumbing breakdown elsewhere in the building. Any public trial can be expected occasionally to involve comparable incidents, and the district court's description of some of the perpetrators as "husky and menacing looking" does not of itself create a *Remmer* presumption of prejudicial contact.

The denial of the motion for a new trial based on appellants' speculative claims of third party contact with a juror was not an abuse of discretion.

Finally, appellants contend that there was insufficient evidence to sustain the jury's verdicts—primarily because the government's witnesses were untrustworthy and not credible. After reviewing the record, we find more than sufficient evidence to support the verdicts and affirm.

The district court is affirmed in all respects.